United States District Court
Southern District of Texas

**ENTERED**

January 13, 2017

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MANTISSA CORPORATION, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:15-cv-1133 |
| ONDOT SYSTEMS, INC., LONE STAR | § | |
| NATIONAL BANK, and LONE STAR | § | |
| NATIONAL BANCSHARES-TEXAS, INC., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## REPORT AND RECOMMENDATION

This is a patent infringement suit. Pursuant to 28 U.S.C. § 636(b)(1)(A), United States District Judge Keith P. Ellison referred the case to this Court to conduct a *Markman* hearing regarding the proper construction of certain patent claim terms. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), *aff'g* 52 F.3d 967 (Fed. Cir. 1995) (en banc). [Dkt. No. 68.] The Court held the *Markman* hearing on November 9, 2016. After considering the parties' arguments and briefing,[1] the evidence presented at hearing, and the applicable law, the Court **RECOMMENDS** that the claim terms at issue be construed as set forth below.[2]

---

[1] Relevant documents include: Plaintiff's Opening Claim Construction Brief [Dkt. No. 60]; Defendants' Response [Dkt. No. 64]; and Plaintiff's Reply [Dkt. No. 67]. The parties also filed Joint Claim Construction Charts [Dkt. No. 69], which they revised in anticipation of the *Markman* hearing [Dkt. No. 71].

[2] Claim construction following a *Markman* hearing has been held to be a non-dispositive pretrial matter appropriate for decision by a United States Magistrate Judge under 28 U.S.C. § 636(b)(1)(A). *Mars, Inc. v. TruRX LLC*, No. 6:13-CV-526, 2015 WL 11232358, at *1 (E.D. Tex. Aug. 6, 2015); *Calypso Wirless, Inc. v. T-Mobile USA Inc.*, No. 2:08-CV-441-JRG-RSP, 2013 WL 684741, at *2 (E.D. Tex. Feb. 25, 2013), *aff'd mem. sub nom. Calypso Wireless, Inc. v. Jimmy Williamson, P.C.*, 586 F. App'x 707 (Fed. Cir. 2014); *SciCo Tec GmbH v. Boston Scientific Corp.*, 599 F. Supp. 2d 741, 742 (E.D. Tex. 2009). However, some courts, finding claim construction to be "potentially dispositive," have concluded that a report and recommendation is more appropriate. *See Spinal Concepts, Inc. v. EBI, L.P.*, No. A-02-CA-636 LY, 2004 WL 5680799, at *1 n.1 (W.D. Tex. Apr. 13, 2004), *adopted*, No. A-02-CA-636-LY, 2004 WL

## I. BACKGROUND

Plaintiff Mantissa Corporation is the exclusive licensee of, and holds all substantial rights and interests in, U.S. Patent Nos. 7,779,456 (the '456 Patent) and 8,353,027 (the '027 Patent). Plaintiff has brought suit against Defendants Ondot Systems, Inc., Lone Star National Bank, and Lone Star National Bancshares-Texas, Inc. (collectively, "Defendants") for infringement of those patents. (First Am. Compl. ¶¶ 9–10; 20–35 [Dkt. No. 38].)[3]

Each of the patents-in-suit is entitled "System and Method for Enhanced Protection and Control Over the Use of Identity" and describes an invention that "provides protection of the identity of an entity by placing limitations or conditions on its use, and whereby the entity's use-enabling identification information is not fully needed to authorize a transaction." ('456 Patent at 1:10–14 [Dkt. No. 38-1]; '027 Patent at 1:17–20 [Dkt. No. 38-2].) According to Plaintiff, the patents "teach methods for an identity owner to proactively control use of his or her identity and identification information by applying a 'leash' to the information where the information was without value to an outside intruder." (Pl.'s Claim Construction Br. at 4–5 [Dkt. No. 60].) While this technology has non-financial applications ('456 Patent at 14:20–57; '027 Patent at 14:30–67), the patent specifications, along with Plaintiff's briefing and presentations to the Court, focus on financial embodiments involving credit or debit card transactions. (*E.g.*, '456 Patent at 4:61–5:6; '027 Patent at 5:3–15; Pl.'s Written Tutorial at 12 [Dkt. No. 57]; Pl.'s Claim Construction Br. at 6–8.)

The *Markman* hearing included testimony from Gary Dennis, a co-inventor of the patents. Plaintiff proffered Mr. Dennis as a person having ordinary skill in the art. Defendants

---

5677003 (W.D. Tex. Aug. 19, 2004). Out of an abundance of caution, the Court will issue a report and recommendation in this case.

[3]  Plaintiff specifically asserts infringement of claims 1–7 and 11–29 of the '456 Patent and claims 1–3 and 7–29 of the '027 Patent. (First Am. Compl. ¶¶ 21, 29; Pl.'s Claim Construction Br. 4.)

had no objection to that proffer or to Mr. Dennis's testimony that, with respect to the patents-in-suit, a person of ordinary skill in the art will typically have a bachelor's degree in electrical engineering or computer science and preferably three years of work experience with computer networks related to financial systems. (*See also* Pl.'s Claim Construction Br. at 10–11.) Mr. Dennis also testified about his own background, his involvement in developing the inventions, and the content of the patents.

## II. LEGAL STANDARD FOR CLAIM CONSTRUCTION

Because claim construction is a matter of law, the task of determining the proper construction of all disputed claim terms lies with the Court. *Markman*, 517 U.S. at 372; *Denneroll Holdings Pty Ltd. v. Chirodesign Grp., LLC*, No. 4:15-CV-740, 2016 WL 705207, at *1 (S.D. Tex. Feb. 23, 2016) (Ellison, J.). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). As a general rule, each claim term is construed according to its "ordinary and customary meaning," which is to say, the meaning the term would have to "a person of ordinary skill in the art in question at the time of the invention" and in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13. "The inquiry into the meaning that claim terms would have to a person of ordinary skill in the art is an objective one." *Innova/Pure Water*, 381 F.3d at 1116.

To begin this inquiry, courts consider the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1313–14. "The appropriate starting point for claim construction 'is always with the language of the asserted claim itself.'" *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 884 (Fed. Cir. 2008) (quoting

*Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)). Courts must then review the specification, which is the part of the patent where the inventor describes and illustrates the invention in significant detail. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also* 35 U.S.C. § 112. Claims "'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979). The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. If it is in evidence, courts should also consider the prosecution history, which consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and includes the prior art cited during the examination of the patent. *Phillips*, 415 F.3d at 1317. The prosecution history, like the specification, provides evidence of how the PTO and the inventor understood the patent. *Id.* However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996).

In most circumstances, analysis of the intrinsic evidence alone will resolve any claim construction disputes. *Vitronics*, 90 F.3d at 1583. However, if the intrinsic evidence does not resolve ambiguities, courts may consider extrinsic evidence. *Phillips*, 415 F.3d at 1317–18. Extrinsic evidence, such as expert and inventor testimony, dictionaries, and treatises, "can shed useful light on the relevant art," but is "less significant than the intrinsic record in determining the legally operative meaning of disputed claim language." *Id.* at 1317  (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)) (internal quotation marks omitted).

4

## III.  CLAIM CONSTRUCTION

In anticipation of the *Markman* hearing, the parties jointly submitted a chart presenting ten claim terms and phrases (or groupings thereof) for the Court's construction. [Dkt. No. 71.] The Court begins with the six terms upon which the parties agree and then turns to the four that remain in dispute. *See Bd. of Regents of Univ. of Tex. Sys. v. A123 Sys., Inc.*, No. 3:06-CV-1655-B, 2011 WL 1135115, at *1 (N.D. Tex. Mar. 29, 2011) (setting out parties' agreed constructions before turning to disputed claim terms).

### A.  Agreed Constructions

The Court recommends adopting the parties' agreed-upon construction of five terms and finding that no construction of a sixth pair of terms is necessary.

#### 1.  "identity"

This term should be construed as "identification information."

#### 2.  "entity"

This term should be construed as "the owner of the **identity**."[4]

#### 3.  "user"

This term should be construed as "requester of use of **entity**'s **identity**."

#### 4.  "source"

This term should be construed as "a person or thing from which the inquiry comes into being or is derived or obtained."

#### 5.  "identity-use-source"

This term should be construed as "a party/point at which use of the entity's identity is attempted."

---

[4]  The parties' proposed constructions often use boldface to indicate terms or phrases that are themselves subject to separate constructions.

**6. "intended use" and "attempted use"**

The parties stated on the record at hearing that no construction of these terms is needed. The Court agrees. *See Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 798 (Fed. Cir. 2010) (proper for district court not to construe term that "was not fundamentally in dispute"); *Atticus Research Corp. v. VMware, Inc.*, No. H-11-1741, 2013 WL 3938516, at *6–7 (S.D. Tex. July 30, 2013) (Rosenthal, J.) (collecting cases).

**B.  Construction of Disputed Claim Terms**

The Court recommends that the disputed terms be construed as follows:

**1. "service provider"**

The term "service provider" is used in claims 1, 5, 11, and 15 of the '456 Patent and claims 1, 7, and 11 of the '027 Patent. Plaintiff proposes to construe this term as "that which addresses requests for **identity** use." Defendants argue no construction is needed. The Court recommends adopting Plaintiff's proposed construction because it is consistent with the language of the relevant claims, the patent specifications, and the prosecution history.

**a.  Claim Language**

The method described in claim 1 of the '456 Patent includes "requesting use of the identity." ('456 Patent at 15:16.) The claim specifies that this "requesting comprises transmitting, from a user of said identity to a service provider which maintains the state, a request for authorization to use the identity, where information in the request is insufficient to authorize the use of the identity." (*Id.* at 15:21–25.) "[A]fter said requesting," the "status of the identity" is returned to the "first state." ('456 Patent at 15:17–18.)

Under the method described in claim 5 of the '456 Patent, upon an attempted use of identity, so-called "second information" is "forward[ed] . . . from the user to a service provider."

('456 Patent at 16:10–12.) The service provider then "determin[es] . . . whether said use of the identity is consistent with at least one pre-registered condition," with the pre-registered condition "defin[ing] at least one circumstance under which the identity can be used." (*Id.* at 16:13–15; 16:20–22.) "[A] decision based on the determining" is then sent "from the service provider to the user." (*Id.* at 16:16–17.)

As the language of these claims—as well as that of the other relevant asserted claims[5]— shows, the function of a "service provider" is to "address" (i.e., deal with) requests for identity use.

**b.  Patent Specifications**

Both patent specifications describe a particular embodiment of the inventions as follows:

> [A]n attempt will be made at a source 27 to use the identity of identity owner 30. . . . User 20 then sends an identity state request 111 to service provider 10, which requests authorization to complete the underlying transaction. Based on the information in identity state request 111 relative to information previously provided by identity owner 30, service provider 10 will determine whether to authorize, limit or deny the requested use. Service provider 10 sends an appropriate response to user 20 in an identity state response 112.

('456 Patent at 4:40–51; '027 Patent at 4:49–60.) The number designations correspond to the following diagram:

---

[5]  Claim 11 of the '456 Patent describes the service provider as "using" sets of information to "respond to a request by the user to authorize a use of the identity of the entity." ('456 Patent at 16:52–56.) Claim 15 of the '456 Patent states that the service provider "receiv[es] . . . a request to determine whether the use of an entity's identity by a party is authorized for a requested application" and "respond[s] . . . consistent with the result" of a set of designated determinations. ('456 Patent at 17:10–25.) Claims 1, 7, and 11 of the '027 Patent are of similar effect.



('456 Patent at Sheet 1; '027 Patent at Sheet 1.) In sum, "service provider 10" receives a request relating to the attempted use of identity, determines an appropriate response, and responds accordingly. Plaintiff's proposed construction accurately captures this function.

Defendants point to other embodiments contained in the '456 Patent specification (Defs.' Resp. at 6–8 [Dkt. No. 64]), but all are consistent with the proposed construction. Indeed, the proposed construction is "the only construction that applies equally to the various embodiments disclosed by the specification." *Weatherford Int'l, Inc. v. Casetech Int'l, Inc.*, No. H-

03CV05383, 2005 WL 1949564, at *5 (S.D. Tex. Aug. 12, 2005) (Ellison, J.). To the extent that certain exemplary embodiments describe specific actions a "service provider" may take in addressing requests for identity use, they provide no basis for rejecting the proposed construction. *See In Re Papst Licensing Digital Camera*, 778 F.3d 1255, 1265 (Fed. Cir. 2014) ("[C]laims are generally not limited to features found in what the written description presents as mere embodiments, where the claim language is plainly broader."); *Innova/Pure Water*, 381 F.3d at 1117 ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect."); *WesternGeco LLC v. Ion Geophysical Corp.*, 735 F. Supp. 2d 623, 628–29 (S.D. Tex. 2010) (Ellison, J.) ("[W]hile the specification may describe very specific embodiments of the invention, the claims are not to be confined to these embodiments.") (collecting cases).

### c.  Prosecution History

In reviewing the '456 Patent application, the PTO rejected what was then claim 13 as being anticipated by prior art. ('456 Patent File History at 38 ¶ 13, 63, 64 ¶ 11 [Dkt. No. 38-6].)[6] Replying to the PTO, the inventors/applicants (Gary and Sharon Dennis) explained that, while the prior art used similar terms (including "service provider"), the functions associated with those terms differed from those under claim 13. (*Id.* at 83 & n.1.) The applicants expressly described the function of a "service provider" under claim 13 in a manner almost identical to the proposed construction, namely: "the service provider addresses requests for identity use (*e.g.*, 'using, by the service provider, at least some of the information provided in said obtaining to respond to a request')." (*Id.* at 83.) The language of claim 13 is now present (with some modifications not relevant here) in claim 11 of the '456 Patent. This history supports adopting

---

[6]   The Court's citations to pages in the patent file history correspond to the Bates numbering used in the electronically-filed documents. E.g., "38" corresponds to "Mantissa 000038."

the proposed construction across the claims of both patents-in-suit. *See Phillips*, 415 F.3d at 1314 ("Because claims terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("We presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

Defendants argue that the prosecution history falls short of proving disclaimer. (Defs.' Resp. at 6.) "[A] prosecution disclaimer requires clear and unambiguous disavowal of claim scope." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) (internal quotation marks and citation omitted). However, Plaintiff does not invoke this history to prove disclaimer. (Pl.'s Reply at 8.) Rather, the prosecution history simply demonstrates "how the inventor understood the invention." *Phillips*, 415 F.3d at 1317; *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (recognizing that prosecution history "plays *various roles* in resolving uncertainties about claim scope" and observing that the high "clear and unmistakable" standard applies where such history is used "*solely* to support a conclusion of patentee disclaimer" (emphases added)); *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321–22 (Fed. Cir. 2013) ("The meaning of the claim language is informed, as needed, by the prosecution history.").

### d. Construction of This Term Is Appropriate

In arguing that the term needs no construction, Defendants assert that "service provider" is "readily understood" and that Plaintiff's proposed construction is so generic that it constitutes an "exercise in redundancy." (Defs.' Resp. at 5–7.) To the contrary, the Court finds that adopting the proposed construction will further a key purpose of claim construction: making the claim

term understandable to a jury of laypersons. *See Power–One, Inc. v. Artesyn Techns., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims." (internal quotation marks omitted)); *Mobile Telecommc'ns Techs., LLC v. United Parcel Serv., Inc.*, No. 1:12-CV-3222-AT, 2014 WL 1274003, at *6–7  (N.D. Ga. Mar. 17, 2014) (explaining that, even when the ordinary meaning of a term applies, that "does not necessarily mean that the Court should not supply to the jury such an ordinary meaning"). Without construction, a jury could well be confused by the meaning of "service provider" as used in the patents-in-suit. *Cf. Smartmetric Inc. v. Am. Exp. Co.*, 476 F. App'x 742, 745 (Fed. Cir. 2012) ("The plain and ordinary meaning of 'network service provider' is a provider of network services.").

### 2. "information . . . is insufficient to authorize the use of the identity"; "the second information is insufficient in and of itself to authorize any related use of the identity"; "the information being insufficient in and of itself to execute the attempted use of the identity"

These three phrases are used, respectively, in claim 1 and claim 5 of the '456 Patent and claim 1 of the '027 Patent. Plaintiff proposes to construe the phrases as "the information is sufficient for the **service provider** to determine whether the **intended use** of the **identity** is proper, but not enough to authorize/execute the use/related use/attempted use of the **identity**."[7] Defendants argue no construction is needed. The Court recommends adopting Plaintiff's proposed construction based on the intrinsic evidence.

### a.  Claim Language

At the outset of the method described in claim 1 of the '456 Patent, a "status of identity" is set to a "first state defining a scope of permitted use of the identity." ('456 Patent at 15:11–12.)

---

[7]   This formulation of the proposed construction incorporates certain revisions Plaintiff's counsel suggested at the *Markman* hearing to reflect the varying language of the three claims.

"[I]n advance of an intended use of the identity, the status" is changed to "a second state . . . different from the first state." (*Id.* at 15:13–15.) There is then a request for use of the identity, which comprises "transmitting" from an identity user to a service provider "which maintains the state, a request for authorization to use the identity, where *information in the request is insufficient to authorize the use of the identity*."  (*Id.* at 15:16; 15:21–25 (emphasis added).) Following the request, the state is "return[ed] . . . back to the first state." (*Id.* at 15:17–18.) This return "occurs in response to completion of a use of the identity." (*Id.* at 15:20.)

The method described in claim 5 of the'456 Patent begins with an "attempt[] to use an identity at a source." (*Id.* at 15:7.) At a later stage, "second information" that is "*insufficient in and of itself to authorize any related use of the identity*" is forwarded to the service provider. (*Id.* at 16:10–12; 16:18–19 (emphasis added).) The service provider "determin[es] . . . whether [the attempted] use of the identity is consistent with at least one pre-registered condition." (*Id.* at 16:13–15.) That "pre-registered condition defines at least one circumstance under which the identity can be used." (*Id.* at 16:20–23.) A "decision based on the determining" is then sent from the service provider to the user. (*Id.* at 16:16–17.)

Claim 1 of the '027 Patent states that the service provider "receiv[es] . . .  information regarding the attempted use of the entity's identity," with that information being "*insufficient in and of itself to execute the attempted use of the identity*." ('027 Patent at 15:22–25 (emphasis added).) The claim further specifies that "the service provider *lacks sufficient data to execute the attempted use of the identity*." (*Id.* at 15:34–35 (emphasis added).) Still, the service provider is charged with "determining . . . whether the attempted use" is "consistent" with "at least one circumstance under which the identity can be used," after which "a decision" is sent from the service provider. (*Id.* at 15:26–33.)

The foregoing language is consistent with the proposed construction. The proposed construction describes information sent to the service provider in terms of (1) that for which it *is not* sufficient, and (2) that for which it *is* sufficient. The claim language italicized in the preceding paragraphs states that the information *is not* "enough to authorize/execute the use/related use/attempted use of the identity." In addition, the language of the claims also demonstrates, by implication, that the information *is* "sufficient for the service provider to determine whether the intended use of the identity is proper." *See HowLink Glob. LLC v. Network Commc'ns Int'l Corp.*, 561 F. App'x 898, 906 (Fed. Cir. 2014) (relying on implication drawn from structure of claim language); *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 395 F. App'x 709, 713 (Fed. Cir. 2010) (same).

Claim 5 of the '456 Patent and claim 1 of the '027 Patent commit to the service provider the task of "determining" whether the information sent to it in conjunction with the attempted use of identity is "consistent" with proper use of the identity. By necessity, the information must be "sufficient" for it to make that determination. The framework of claim 1 of the '456 Patent supports the same implication. Although this claim does not refer to the service provider making any "determination," the service provider "maintains the state" of the status of the identity, which "defin[es] a scope of permitted use of the identity." Following the request to the service provider for authorization to use the identity, the state is "return[ed] . . . back to the first state." (*Id.* at 15:17–18.) This return "occurs in response to completion of a use of the identity." For this sequence to make sense—and given that the service provider's function is to address requests for identity use—the information in the request to the service provider must at least be sufficient "to determine whether the intended use of the identity is proper." Defendants point to nothing in the

claim language inconsistent with this construction.[8]

### b.  Patent Specifications

Both specifications discuss the following preferred embodiment, which corresponds to

the diagram incorporated above:

> [I]dentity state request 111 preferably includes *at least enough information* to allow service provider 10 to locate the account information of the particular identity owner 30 and to determine the corresponding user instructions. However, the information in identity state request 111 is preferably *in and of itself insufficient* to enable the use of the identity for its intended use, such that its capture or loss would not expose vital information.

(’456 Patent at 4:54–61; ’027 Patent at 4:63– 5:3 (emphasis added).) The specifications then give

the following “non-limiting example”:

> [I]f the triggering event is use of a credit card, then the credit card company (user 20) sends to service provider 10 in identity state request 111 the name, address and phone number of identity owner 30, as well as the last four digits of the credit card. *From this information, service provider 10 can determine* whether use of the credit card is authorized at that time. Yet the information in identity state request 111 is either public (name, address, and phone number being in phone books) and/or useless (four digits of a credit card being insufficient for a transaction). This provides a layer of protection to the use of the identity of an entity that is not confined to service provider 10.

(’456 Patent at 4:62–5:6; ’027 Patent at 5:3–15 (emphasis added).)

---

[8]  Defendants object that the proposed construction “improperly inserts that the request is for the service provider.” (Defs.’ Resp. at 16.) But the claim language clearly states that the request “comprises transmitting, from a user of said identity *to a service provider* which maintains the state, *a request* for authorization to use the identity.” (’456 Patent at 15:21–24 (emphasis added).)

No party mentions it, but the language of claim 6 of the ’456 Patent merits a brief discussion. That claim is dependent upon claim 5, but adds the following: “[w]herein the at least one pre-registered condition comprises at least one of allowance of use, limitation of use, expansion of use, denial of use, or *insufficient information to make a determination*.” (’456 Patent at 16:23–26 (emphasis added).) “Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend.” *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003). But that presumption is rebuttable, *see Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008), and it could be argued that instead of narrowing the meaning of claim 5, the additional language in claim 6 merely illustrates what a “pre-registered condition” may include, *even under* claim 5 itself. Nonetheless, in light of the entirety of the intrinsic evidence, and the fact that neither of the other asserted claims contains a similar linguistic suggestion, claim 6 of the ’456 Patent is not inconsistent with the proposed construction.

These examples support the proposed construction. In particular, the italicized language corresponds closely to both the *is* and *is not* aspects of the construction and reaffirms that the service provider makes a determination based on the information sent to it. *See Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1466 (Fed. Cir. 1998) ("Although claims are not necessarily restricted in scope to what is shown in a preferred embodiment, neither are the specifics of the preferred embodiment irrelevant to the correct meaning of claim limitations.").

### c.  Prosecution History

The PTO initially rejected various claims in the '027 Patent application as being anticipated by prior art. (*See* '027 Patent File History at 410–11 [Dkt. No. 38-10].) In response to the PTO's rejection of what was then designated as claim 27, the applicants stated that, under the prior art, the information provided in the request is "sufficient, in and of itself, to effectuate use of the identity." (*Id.* at 427.) The applicants distinguished the prior art as being "the exact opposite" of language used in claim 27, which stated that the information is "insufficient in and of itself to execute the attempted use of the identity." (*Id.*) In addition, the applicants amended claim 27 to include the recitation, "wherein the service provider lacks sufficient information to execute the attempted use of the identity," stating:

> This language reflects the service provider's limited role in the transaction underlying the attempted use of the identity—*the service provider has enough to determine whether the attempted use of the identity is proper, but not enough to execute the use of the identity for the transaction itself*. This limits potential abuse of the identity by the service provider or some third party.

(*Id.* at 427–28 (emphasis added).) The PTO subsequently issued a notice of allowability encompassing claim 27. In the statement of reasons for allowance, the examiner wrote that the "amendment incorporating service provider lacks sufficient data to execute the use of identity is not found in prior art." (*Id.* at 453.) The language of this amendment to then-pending claim 27

15

was ultimately incorporated into claim 1 of the '027 Patent.

This history supports Plaintiff's proposed construction. The applicants' explicit distinction of the prior art supports the proposed construction's description of what the information is "not enough" to permit. Moreover, the applicants explained their amendment in terms nearly identical to the language of the proposed construction, specifying that "the service provider has enough to determine whether the attempted use of the identity is proper." This shows that the inventors understood the patents consistent with the proposed construction. *See Phillips*, 415 F.3d at 1317; *Omega Eng'g*, 334 F.3d at 1334.

### d.  Defendants' Remaining Arguments Lack Merit

Defendants argue that it is improper to give a common construction to the three separate claim phrases. (Defs.' Resp. at 16.) However, the three phrases are similar and are used in a similar way in each of the claims. *See Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 182 F. App'x 994, 998–99 (Fed. Cir. 2006) (relying on "the established rule of claim interpretation that dictates that like terms should be construed consistently across related claims"). The Court finds that the proposed construction accurately captures the meaning of each phrase.

Defendants also attack what they describe as Plaintiff's attempt to "act as its own lexicographer." (Defs.' Resp. at 19.) *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008) ("A patentee may act as its own lexicographer and assign to a term a unique definition that is different from its ordinary and customary meaning; however, a patentee must clearly express that intent in the written description."). Plaintiff cites the lexicographer doctrine, but only indirectly. (*See* Pl.'s Claim Construction Br. at 30.) In any case, the Court need not decide whether the doctrine applies here because the intrinsic evidence, taken

as a whole, plainly supports the proposed construction. *See Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." (internal quotation marks and citations omitted)); *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[A] claim term may be clearly redefined without an explicit statement of redefinition.").

The Court concludes that construction of the disputed phrases is appropriate and that the proposed construction accurately captures the meaning of the phrases in light of the claim language, specifications, and prosecution history.[9]

### 3. "the service provider lacks sufficient data/information to execute the attempted use of the identity"

This phrase is used in claims 1 and 11 of the '027 Patent. Plaintiff proposes to construe the phrase as "the **service provider** has enough information to determine whether the **attempted use** of the **identity** is proper, but not enough to execute the **attempted use** of the **identity**." Defendants argue that no construction is needed. The Court recommends adopting Plaintiff's proposed construction.

This phrase is similar to the phrase "the information being insufficient in and of itself to execute the attempted use of the identity," which is also used in claim 1 of the '027 Patent. Plaintiff argues that the latter phrase "ascribes a quality of the message from the user to the service provider," whereas the instant claim language "ascribes a quality of the service provider itself" and "excludes the service provider from having obtained executing level information from

---

[9]  Because the intrinsic evidence alone resolves the claim construction dispute, the Court does not rely on extrinsic evidence. In particular, the Court does not rely on Plaintiff's arguments regarding the concept of "tokens" or Gary Dennis's testimony regarding "tokens."

another source." (Pl.'s Claim Construction Br. at 30–31.) The Court agrees with Plaintiff, based on essentially the same intrinsic evidence used in construing the previous set of phrases. Nothing in the language of claim 1 or 11, or in the embodiments described in the specification, suggests that the service provider ever obtains from any other source information that would permit execution of the attempted use of identity; the clear implication of both is the contrary. Furthermore, the applicants' statement to the PTO that "the service provider has enough to determine whether the attempted use of the identity is proper, *but not enough to execute the use of the identity for the transaction itself*" directly supports the proposed construction. ('027 Patent File History at 427–28 (emphasis added).)

Contrary to Defendants' argument, adopting this construction would not "rewrite" the claim language and "import[] additional concepts into the phrase." (Defs.' Resp. at 17.) *See Helmsderfer*, 527 F.3d at 1383 ("Courts cannot rewrite claim language."); *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."). Rather, the construction reflects the phrase's meaning in light of the claim language taken as a whole. *See Aloft Media, LLC v. Adobe Sys. Inc.*, 570 F. Supp. 2d 887, 897 (E.D. Tex. 2008), *adopted*, No. 6:07-CV-355, 2008 WL 5784443 (E.D. Tex. Sept. 24, 2008). Plaintiff's proposed construction will therefore make the phrase easier for a jury to understand. *See Candela Corp. v. Palomar Med. Techs., Inc.*, No. 9:06-CV-277, 2008 WL 3285255, at *4 (E.D. Tex. Aug. 6, 2008) ("[T]he purpose of claim construction is to construe those terms that might be unfamiliar or confusing to the jury, or which are unclear or ambiguous in light of the specification and patent history."); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is meant "to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of

infringement.").

### 4. "scope of permitted use"

This term is used in claims 1, 2, and 4 of the '456 Patent. Plaintiff proposes to construe the term as "set of conditions under which the **identity** may or may not be used." Defendants argue no construction is needed; in the alternative, they argue that the term be construed as "set of conditions under which the **identity** may be used." The Court recommends adopting Plaintiff's proposed construction based on the intrinsic evidence.

#### a. Claim Language

The three claims use the term "scope of permitted use" to describe the first two steps of their respective methods, as follows:

> setting a status of the identity to a first state, the first state defining a scope of permitted use of the identity;

> changing, in advance of an intended use of the identity, the status to a second state defining a scope of permitted use of the identity that is different from the first state; . . .

('456 Patent at 15:11–15; 15:32–36; 15:56–60.) The proposed construction is consistent with this language.

#### b. Patent Specification

In support of the proposed construction, Plaintiff emphasizes this portion of the specification:

> Service provider 10 is configured to allow identity owner 30 to set up, manage, and *edit identification information* stored in the corresponding account profile 14. . . . The *information* which identity owner 30 provides to service provider 10 *reflects the intent of the identity owner 30 to, by way of non-limiting example[,] allow, deny, limit, secure, protect or otherwise control a type of use of the identity* of an entity. *The nature and scope of the control and management of identity use is essentially unlimited* and based only on the parameters as may be defined by user 20 and identity owner 30. By way of non-limiting example, identity owner 30 could set up account profile 14 as follows:

(1) credit cards *can only* be used between 9 AM and 11 PM.

(2) medical information *is available at all times but only* to users 20 that are preauthorized for health services (e.g., doctors, hospitals, pharmacies).

(3) applications for loans or new credit are *never* to be approved.

Limitations such as the above establish default and real-time use control over the identity of an identity owner 30. . . . If identity owner 30 needs to use its identity in a manner inconsistent with the above limitations, then identity owner 30 can modify account profile 14 in advance of such use and then return account profile 14 to its prior state (or any other desired state) after the need for the use concludes.

('456 Patent 5:24–53 (emphases added).)[10]

Given that "the nature and scope of the control and management of identity use is essentially unlimited" and includes both "allow[ing]" and "deny[ing]" use of the identity based on the defined "parameters," the "scope of permitted use" can ostensibly be described in terms of (i) conditions under which the identity "may" be used, (ii) conditions under which it "may not" be used, and/or (iii) some combination of "may" and "may not" conditions. The "non-limiting example" bears this out. The first and second parameters are defined by use of the word "only" and thus contain both a "may" component and a "may not" component. For example, that "credit cards *can only* be used between 9 AM and 11 PM" means both that credit cards "may" be used between those hours *and* that credit cards "may not" be used after 11 PM and before 9 AM. Because the third parameter uses the word "never," it contains only a "may not" condition—i.e., "applications for loans or new credit" *may not* "be approved."

Plaintiff points to another embodiment in the specification to show that the "scope of permitted use" can be described solely in terms of a "may not" condition:

---

[10] The number designations correspond to Figure 2. ('456 Patent at Sheet 2.)

> In a related example, object template 16 allows an identity owner 30 to set the default status of the credit identification instrument (e.g., the credit card or underlying account) as on or off. In this example, identity owner 30 sets the default of the credit card to "deny," essentially placing the use of the credit card in a lockdown state. If identity owner 30 wants to use the credit card at a particular time, then identity owner 30 can contact service provider 10 via, e.g., the Internet to change identity state 17 at the appropriate time, such as between 12:30 PM and 2:30 PM that day. Identity owner 30 makes the purchase, or not, secure in the knowledge that use of the credit instrument was permitted within that limited two-hour window. Before the window opens, and after it closes, the default state is "deny," thus preventing any unauthorized (or even authorized) use outside that window.

('456 Patent at 8:46–60.)

In this embodiment, the "default status" corresponds to the claim language referring to "the first state defining a scope of permitted use of the identity." As the example illustrates, the identity owner can set the default status to "off" or "deny," which "essentially plac[es] the use of the credit card in a lockdown state." In that case, the default status defines the scope of permitted use solely in terms of a "may not" condition, i.e., the identity *may not* be used. The identity owner can then change the status to permit use, but that new status would correspond to the claim language referring to "a second state defining a scope of permitted use of the identity that is different from the first state."

Plaintiff's proposed construction makes clear that the "scope of permitted use" can be defined by a set of "may" and/or "may not" conditions and is thus in harmony with the specification.

### c.  Prosecution History

Neither Plaintiff nor Defendants cite any portion of the prosecution history.

### d.  Defendants' Arguments Against the Proposed Construction Are Meritless

Defendants argue that Plaintiff's proposed construction reads out the word "permitted" from "scope of permitted use" because it encompasses "any" non-exhaustive set of conditions

under which the identity "may not" be used. (Defs.' Resp. at 10.) There are two distinct aspects to this argument. First, Defendants suggest that the scope of "permitted" use cannot be described by "may not" conditions because "may not" conditions describe what is *not* permitted. However, as the specification shows, even a single "may not" condition (such as "deny") can be used to define a scope of permitted use. Defendants' alternative proposed construction—"set of conditions under which the **identity** may be used"— could be confusing to the jury when there is no set of conditions under which the identity "may" be used.

Second, Defendants contend that Plaintiff's proposed construction would allow the "scope of permitted use" to be defined by a *non-exhaustive* set of "may not" conditions. (Defs.' Resp. at 11.) As they state, "knowing some (but not all) of the conditions under which an identity may not be used is not the same as knowing the scope of permitted use." (*Id.*)   At hearing, Defendants stated that they would accept Plaintiff's proposed construction, provided it was modified to read "*the full* set of conditions under which the **identity** may or may not be used.." Given the entirety of the intrinsic evidence, the Court rejects this modification as redundant. Plaintiff's proposed construction, when read in conjunction with the claim language, makes clear that "scope of permitted use" means an exhaustive set of conditions. *See Ethicon*, 103 F.3d at 1568 (claim construction "is not an obligatory exercise in redundancy").

Defendants also assert that no construction of this term is needed. However, in light of the points raised by the parties, the Court concludes that the jury would benefit from a construction making the term's meaning clear. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve

the parties' dispute.").

## IV.  CONCLUSION

The Court **RECOMMENDS** that the claim terms be construed as set forth above. Any party may file objections within fourteen days of being served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

Signed on January 13, 2017, at Houston, Texas.

_____
Dena Hanovice Palermo
United States Magistrate Judge